*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LYNN BETH BAUM,

      Plaintiff/Counterdefendant-
      Appellee/Cross-Appellant,

v

DAVID BAUM, DB ACQUISITION, LLC, DAVID
M. BAUM REVOCABLE TRUST, and N.W.
PROPERTIES, LLC,

      Defendants,

and

DAVID M. BAUM, PC,

      Defendant/Cross-Defendant,

and

HOWARD BAUM,

      Defendant/Counterplaintiff/Cross-
      Plaintiff-Appellant/Cross-Appellee,

and

MADISON EQUITIES, LLC and FRASER
EQUITIES, LLC,

      Defendants-Appellants/Cross-
      Appellees,

UNPUBLISHED
June 24, 2021

No. 351269
Oakland Circuit Court
LC No. 2015-149725-CZ

LYNN BETH BAUM,

        Plaintiff/Counterdefendant-Appellee,

v

DAVID BAUM, DB ACQUISITION, LLC, DAVID
M. BAUM REVOCABLE TRUST, MADISON
EQUITIES, LLC, N.W. PROPERTIES, LLC, and
FRASER EQUITIES, LLC,

        Defendants,

and

DAVID M. BAUM, PC,

        Defendant/Cross-Defendant,

and

HOWARD BAUM,

        Defendant/Counterplaintiff/Cross-
        Plaintiff-Appellant.

No.  353066
Oakland Circuit Court
LC No.  2015-149725-CZ

---

Before:  REDFORD, P.J., and BORRELLO and TUKEL, JJ.

PER CURIAM.

This action arises from plaintiff Lynn Beth Baum's efforts under the Uniform Fraudulent Transfers Act (UFTA),[1] MCL 566.31 *et seq*., to recover funds that her then husband, David Baum, transferred to his brother, Howard Baum, in contemplation of Lynn and David's divorce.  After Lynn and David's divorce became final, Lynn filed the instant action to recover the funds.  In Docket No. 351269, Howard Baum, Madison Equities, LLC, and Fraser Equities, LLC (collectively "the Howard defendants"), appeal as of right after entry of the court's final order dismissing defendant N.W. Properties, LLC, from the action.  Lynn cross-appeals from the same order.  In Docket No. 353066, Howard appeals as of right an order holding him in criminal contempt of court.  The trial court sentenced Howard to five days in jail pursuant to MCL 600.1715(1).  This Court ordered these appeals consolidated for the efficient administration of the

---

[1] The act was later renamed as the Uniform Voidable Transfers Act, effective April 10, 2017. 2016 PA 552; MCL 566.45(1).

appellate process.[2]  For the reasons provided below, in Docket No. 351269 we affirm in part, reverse in part, and remand for further proceedings, and in Docket No. 353066 we affirm.

## I.  FACTUAL BACKGROUND

In a prior appeal in this case, this Court summarized the pertinent factual background as follows:

> Lynn sued David for divorce in April 2012.  Her complaint averred that soon after she advised David of her plan to file for divorce, he transferred virtually all of their liquid marital assets to Howard or accounts controlled by Howard.  Lynn filed a motion for return of the funds; the family court granted the motion and appointed a receiver.

> Shortly thereafter, Howard sued Lynn and David in the Oakland Circuit Court, alleging that they owed him hundreds of thousands of dollars for repayment of loans he had made to them.  According to Howard, the Baums regularly borrowed money to pay for their children's private school tuition, home renovations, medical expenses, and family celebrations.  Lynn responded with a counterclaim against Howard and a cross-claim against David, asserting that the loan claim was fabricated to justify David's looting of the marital estate.  The receiver in the divorce case intervened in Howard's contract action and moved to consolidate the cases in the family court.  David opposed this motion, and the family court judge denied it.

> Howard's contract case went nowhere, however, as Howard fired his attorney and failed to appear at a status conference, resulting in dismissal of the matter "without prejudice."  The circuit court's order provided that the case could be reinstated on a showing of good cause and the payment of Lynn's fees and costs. Howard attempted to reinstate the matter, but the circuit court was unsatisfied with his effort and again dismissed it without prejudice.  Howard took no further action to pursue his breach of contract case.

> Meanwhile, the Baums' divorce proceeded to arbitration.  The arbitrator defaulted David based on his failure to cooperate during discovery and disallowed his testimony.  Nevertheless, the arbitrator permitted David to contest whether the transfers to Howard represented payments for enforceable marital debts. Ultimately, the arbitrator found that David had withdrawn approximately $1.2 million from various marital accounts and paid Howard more than $1 million. The arbitrator noted the absence of

> > any promissory notes or other documentation of a loan or series of loans by Howard . . . to David [and/or Lynn].  There is no evidence

---

[2] *Lynn Beth Baum v David Baum*, order of the Court of Appeals entered August 26, 2020 (Docket Nos. 351269 and 353066).

of any specific amount of loaned money. There is no evidence that there were any terms of repayment, such as balance owed and interest rate. There is no evidence of how Howard . . . paid money to David [and/or Lynn] or to providers such as the children's private schools.

The arbitrator concluded, "There is no legally recognized marital debt to Howard Baum. All of the money removed from the accounts described above is part of the marital estate." He further found that David's

> withdrawals of money from the marital estate and transfers of money to [Howard] constitutes fraudulent activity as defined by the [Uniform Fraudulent Transfers Act] UFTA. As such, there is a Chose in Action to recover the fraudulently transferred assets. This Chose in Action is awarded to Lynn. . . . In the event that any of the fraudulently transferred assets are recovered, Lynn . . . shall receive the first $742,650.80 of the recovered assets (60% of the monies taken from the marital estate by David . . .), plus her reasonable attorney fees and costs incurred in the recovery process. Further, it is held that David['s] actions in transferring the marital monies to himself and his brother created a debt to Lynn . . . which David . . . owes to her in the amount of $742,650.80.

The family court adopted the arbitrator's findings in its default judgment of divorce. That judgment provides, in part:

> There is no legally recognized marital debt owed to Howard. . . .
>
> [David's] withdrawals of funds from the marital estate and the transfer of funds to [Howard] constitutes fraudulent activity as defined by [UFTA]. [Lynn] is awarded a Chose of Action to recover the funds [David] removed from the marital estate. The money transferred from [David] to himself and to Howard . . . and entities owned by Howard . . . constitute fault and therefore, [Lynn] is awarded 60% and [David] is awarded 40% of those funds.
>
> [Lynn] is awarded 60% of the monies [David] withdrew from the marital estate, which as of the date of the Arbitration Award is $742,650.80. In the event that any of the fraudulently withdrawn money/assets are recovered, [Lynn] shall receive the first $742,650.80 of the recovered assets, and she shall be awarded reasonable attorney fees and costs incurred with the recovery process.

> [David's] fraudulent withdrawal of marital funds has created a debt due to [Lynn] which [David] shall owe in the amount of $742,650.80.

> \* \* \*

> Following the entry of the default judgment of divorce, Lynn filed this action against Howard, David, and entities owned or controlled by them.[3] Her complaint sets forth claims of fraudulent transfers, fraud, piercing the corporate veil, common-law and statutory conversion, unjust enrichment, and racketeering. Howard filed a countercomplaint against Lynn and a cross-claim against David alleging breach of contract, account stated, and unjust enrichment. His allegations essentially restate his complaint in his abandoned contract case. [*Baum v Baum*, unpublished per curiam opinion of the Court of Appeals, issued October 16, 2017 (Docket No. 333173), 2-4.]

Lynn sought summary disposition and argued, *inter alia*, that Howard could not assert that he was the couple's creditor because the doctrine of res judicata prevented such an argument. The trial court agreed that the divorce judgment precluded Howard from making such a claim. *Id*. at 4. This Court reversed and remanded because Howard and David were not in privity in the divorce action, making res judicata or (more appropriately) collateral estoppel inapplicable in the present case. *Id*. at 5-8.

On remand, the case proceeded to a jury trial at which evidence established that Howard had provided some financial support to Lynn and David's family by paying to help renovate two of their houses, for medical treatments, contributing to many of their children's religious celebrations, and paying for the children's private schooling. Howard asserted that he, Lynn, and David always understood that most of the payments were considered loaned money given with the intention that Howard would be reimbursed an amount totaling $1,146,202. The parties, however, never discussed any loan terms and Lynn denied the existence of any loan except for the home renovations.

Lynn testified that, in late February 2012, she hired a divorce attorney and later told both David and Howard that she intended to file for divorce. Thereafter, David issued several checks to Fraser Equities, one of Howard's companies. The total transferred to Fraser Equities amounted to $771,451.76, and Howard, as Fraser Equities's sole member, deposited all of the funds into Fraser Equities's account. Both David and Howard maintained that the payments were intended to partially satisfy the debt that Lynn and David owed Howard. Additionally, David took $240,583.90 from his law firm's profit-sharing pension fund and gave it to another of Howard's companies, Madison Equities. This transfer purportedly represented a loan to Madison Equities, as evidenced by a promissory note. David explained that he loaned Howard the money because he owed Howard money. Even though David characterized the $240,583.90 as a loan, David

---

[3] On the face of her complaint, Lynn did not reference the prior divorce action but only mentioned the case that Howard had initiated that had been dismissed.

-5-

maintained that the transfer represented an effort to repay Howard. David transferred a total of $1,012,035.66 to Howard's companies.

Respecting Lynn's claim of fraudulent transfers, the jury found that David transferred no money to Howard, $240,583.90 to Madison Equities, and $771,451.76 to Fraser Equities with the intent to hinder, delay, or defraud Lynn. Regarding Howard's claim of breach of contract to repay a loan, the jury found Lynn and David individually liable to Howard each in the amount of $39,525.

Thereafter, Lynn moved for entry of judgment against Howard, Madison Equities, and Fraser Equities. In response, Howard argued, in pertinent part, that judgment under the UFTA can only issue against the first transferee of the asset *or* the person for whose benefit the transfer had been made, but not *both*. On March 20, 2019, the trial court entered a judgment that awarded Lynn $306,638.37 against Madison Equities and $982,927.08 against Fraser Equities. The trial court also awarded Howard $43,271.63 on his claim against Lynn and $43,271.63 on his claim against David. All of the awards included postjudgment interest, but the judgments in favor of Lynn also included awards of attorney fees. Specifically, the trial court determined that reasonable attorney fees totaled $180,000, of which the court apportioned $42,840 against Madison Equities and $137,160 against Fraser Equities.

Lynn moved for reconsideration arguing that the judgments in her favor should have been entered against Howard personally because he was the person for whose benefit the transfers were made. The trial court noted that the jury had not been charged with the task of making such factual finding, but agreed that the evidence clearly established that the transfers were for Howard's benefit. Consequently, the trial court granted the motion for reconsideration and ordered Lynn to "submit an amended judgment that allows plaintiff to seek the judgment against Madison Equities, LLC and Fraser Equities from Howard Baum as the person for whose benefit the transfer was made." After Lynn filed the proposed judgment, the Howard defendants objected, arguing that it improperly omitted the Madison Equities and Fraser Equities entities. The trial court decided to allow the parties to fully brief the matter (because defendants had not been permitted to respond to Lynn's motion for reconsideration) and to hold a hearing.

The primary issue at the hearing concerned whether the trial court could enter a judgment against Howard when the fraudulent transfers were made to Madison Equities and Fraser Equities, and despite the fact that the jury never made any finding that Howard benefited from those transfers. After requesting supplemental briefs,[4] the trial court concluded that, absent a jury finding that Howard constituted the person for whose benefit the transfers were made, it could not amend the judgment to reflect that the transfers were indeed for the benefit of Howard. The trial court, therefore, affirmed defendants' objections and denied Lynn's motion for reconsideration. The trial court entered a new judgment, dated September 30, 2019, which provided that Madison

---

[4] The trial court also granted Lynn's request for an injunction. The December 17, 2018 order stated:

> An injunction is entered against further disposition by the debtor, David Baum and the transferees, Howard Baum, Madison Equities, LLC and Frasier [sic] Equities, LLC for the assets transferred or of their other property.

-6-

Equities owed Lynn $311,889.41 and Fraser Equities owed Lynn $999,888.71, which included awards of attorney fees of $42,840 payable by Madison Equities, and $137,160 payable by Fraser Equities. The judgment further provided that Lynn and David each owed Howard $44,154.50.

In August 2019, Lynn moved to require the Howard defendants to show cause why they should not be held in contempt for violating the trial court's December 17, 2018 injunction restraining asset transfers. Lynn argued that four months after entry of the injunction and two days after entry of the trial court's March 20, 2019 judgment, Fraser Equities sold real property for $680,000. The Howard defendants responded that the March 20, 2019 judgment did not preserve or continue the December 2018 injunction.

The trial court conducted a show-cause hearing on October 4, 2019, and December 5, 2019, primarily to consider the issue whether the trial court's December 17, 2018 order enjoining Fraser Equities from transferring any of its assets, survived entry of the March 20, 2019 judgment. The trial court stated that it would issue its opinion after receiving and reviewing the parties' proposed findings of fact and conclusions of law. On February 28, 2020, with all parties present, the trial court entered an order requiring, in pertinent part, Howard "to appear on March 6, 2020 at 8:30 a.m. The court will issue its opinion on the order to show cause on that date."

On March 6, 2020, Howard did not appear as ordered. Howard's counsel told the trial court that Howard sent him an e-mail early that morning saying that he had a 103-degree fever. The trial court reiterated that Howard had been ordered to appear, "temperature or not" and stated that if Howard did not appear by 11:00 a.m., it would issue a warrant for Howard's arrest. The court reconvened after 11:00 a.m., and Howard still failed to appear. When the trial court asked Howard's co-counsel if he had anything to say regarding Howard's absence, counsel responded that Howard had been battling the flu since mid-January. The trial court noted that, despite having these symptoms since mid-January, Howard had been present on February 28. Counsel could not recall whether Howard felt ill on February 28. When asked if counsel had any reason to think that Howard had been hospitalized, counsel responded in the negative. Howard's co-counsel stated that he saw Howard the previous afternoon and that Howard looked "ashen." Howard had not responded to any messages (voice or text) that his counsel sent to him that morning. The trial court did not find counsels' representations persuasive. The trial court expressed concern that Howard appeared to merely attempt to avoid being present when the trial court entered its opinion and order regarding contempt. The trial court noted that no evidence corroborated Howard's reason for being absent aside from counsels' representations. The trial court then found Howard in contempt for failing to appear as ordered. The trial court, however, decided to withhold the order from formal entry until 3:00 p.m. that afternoon permitting Howard to appear by then to avoid arrest. The trial court adjourned and resumed the proceedings at 3:27 p.m. Although Howard attended, the trial court noted that he had not been present at 3:00 p.m. His counsel stated that Howard had been at urgent care being diagnosed with pneumonia and then went to the pharmacy before coming to

court. The trial court found Howard to be in contempt of court for failing "to appear as ordered on three separate occasions" and ordered him remanded to the Oakland County Jail for five days.[5]

## II. DOCKET NO. 351269

### A. TRANSFER OF CASE TO FAMILY DIVISION

Howard and Madison Equities argue that the trial court erred by not transferring the case to the family division of circuit court because the adjudication of the divorce occurred in that court.[6] This issue is not preserved for appellate review. Neither Howard nor Madison Equities ever sought transfer of the case to the family division of circuit court. At most, they asserted that *if* the trial court concluded that the proceedings were supplemental to the divorce judgment, then the case should be transferred. Notably, however, they argued the opposite by contending that the proceedings were *not* supplemental to the divorce judgment, and the trial court agreed with them on that issue.

Accordingly, we decline to address this unpreserved issue. "This Court will generally decline to address unpreserved issues unless 'a miscarriage of justice will result from a failure to pass on them, . . . the question is one of law and all the facts necessary for its resolution have been presented, or [it is] necessary for a proper determination of the case.' " *Autodie, LLC v Grand Rapids*, 305 Mich App 423, 431; 852 NW2d 650 (2014). We are not persuaded that a miscarriage of justice will result from declining to address this issue. The Howard defendants were accorded a fair trial in the circuit court before a jury, and to the extent they lament now how Lynn obtained certain orders from the family court while this proceeding pended, because these defendants were not parties to the divorce action, they were not bound by any of those orders.

### B. WAIVER IN STIPULATED ORDER

Howard and Madison Equities argue that because Lynn later waived her underlying claim against David, she could not maintain her UFTA action against them, and the trial court erred when it denied their motion for a directed verdict and also erred when it denied their request for leave to file a motion for summary disposition before the start of trial. Because Lynn did not waive her underlying claim against David, however, defendants are not entitled to any relief respecting this issue.

We review for an abuse of discretion the trial court's decision to deny leave to file an untimely motion for summary disposition. See *In re King*, 186 Mich App 458, 466; 465 NW2d 1 (1990). We review de novo a trial court's decision on a motion for a directed verdict. *Anaya v*

---

[5] The trial court noted that it would hold its opinion and order on the underlying criminal contempt charge in abeyance and that the parties were to appear on March 16, 2020, for issuance of that opinion. But because of the emergence of the COVID-19 pandemic, civil proceedings were held in abeyance. The record on appeal does not include any decision whether the court found Howard in contempt for violating the December 17, 2018 order.

[6] Howard and Madison Equities do not contend that the trial court lacked subject-matter jurisdiction.

*Betten Chevrolet, Inc*, 330 Mich App 210, 215; 946 NW2d 560 (2019). We also review de novo the extent to which these issues involve the proper interpretation of a statute or a stipulated order. *Miller v Mercy Mem Hosp Corp*, 466 Mich 196, 201; 644 NW2d 730 (2002); *In re Nestorovski Estate*, 283 Mich App 177, 183; 769 NW2d 720 (2009).

Under the UFTA, "a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." MCL 566.34(1)(a). Thus, a plaintiff must be a "creditor" of the transferor to set aside a fraudulent transfer made by the transferor. A "creditor" is defined in the UFTA as "a person that has a claim" and a "debtor" is "a person that is liable on a claim." MCL 566.31(d) and (f). Further, a "claim" is defined as "a right to payment." MCL 566.31(c).

In this case, the judgment of divorce provided that David owed Lynn $2,874 a month for spousal support. The judgment of divorce set forth this requirement in a portion titled "**SPOUSAL SUPPORT**." The judgment of divorce also specified under a section titled "**FRAUD AND CHOSE OF ACTION**" that David owed Lynn $742,650.80 for monies he withdrew from the marital estate and transferred to Howard.[7] The judgment further stated that "[t]he recovery of the money will be necessary to insure the proper financial support of Plaintiff and as such, the debt created by Defendant by way of his removal of marital assets is a domestic support obligation as defined in Section 101 (14A) of the Bankruptcy Act." Therefore, because David was adjudged liable to Lynn for this money, Lynn had a "claim," i.e., a right to payment, against David as defined under MCL 566.31(c).

On May 16, 2018, Lynn and David entered into a stipulated order modifying spousal support. The order stated, in pertinent part:

> IT IS FURTHER ORDERED that Alimony will be paid to Plaintiff in the amount of $150 each month.
>
> IT IS FURTHER ORDERED any reference from the Friend of the Court and the Oakland County Circuit Court to any and all other alimony, spousal support or arrearage are waived and held for naught and shall be eliminated.

Howard and Madison Equities maintain that, because Lynn waived her right to spousal support from David in their stipulated order, she necessarily waived her right to the $742,650.80 previously awarded to her because the initial judgment of divorce characterized that amount owed as a "domestic support obligation." We disagree.

Stipulated orders are to be construed as contracts. *In re Nestorovski Estate*, 283 Mich App at 183. "If the contractual language is unambiguous, courts must interpret and enforce the contract as written because an unambiguous contract reflects the parties' intent as a matter of law."

---

[7] The arbitrator and divorce court specifically found that David had withdrawn $1,237,751.33 from the marital estate and that Lynn was entitled to 60% of that amount, or $742,650.80.

*Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 292; 778 NW2d 275 (2009) (citation omitted). If, on the other hand, a contract is ambiguous, then it is a question of fact that is to be decided by the jury. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003). "A contract is ambiguous when two provisions irreconcilably conflict with each other or when a term is equally susceptible to more than a single meaning." *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007) (quotation marks, citations, and brackets omitted).

The judgment of divorce characterized the marital property owed to Lynn as a "domestic support obligation as defined in Section 101 (14A) of the Bankruptcy Act."[8] 11 USC 101(14A) provides, in relevant part:

> The term "domestic support obligation" means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is—
>
> (A) owed to or recoverable by—
>
> (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative
>
> * * *
>
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated[.]

This definition does not mean that David's debt of $742,650.80 to Lynn because of his fraud constituted alimony or spousal support. The bankruptcy code specifies that such an obligation is "*in the nature* of alimony, maintenance, or support . . . without regard to whether such debt is expressly so designated." 11 USC 101(14A)(B) (emphasis added). But, because a debt may be in the *nature* of spousal support, does not mean that it is in *actuality* spousal support. In fact, in Michigan, when a court distributes and divides marital property in a divorce, the court is to consider many factors, including:

> (1) the duration of the marriage, (2) the contributions of the parties to the marital estate, (3) the age of the parties, (4) the health of the parties, (5) the life situation of the parities, (6) *the necessities and circumstances of the parties*, (7) the parties' earning abilities, (8) the parties' past relations and conduct, and (9) general

---

[8] In a bankruptcy proceeding, characterization of a debt as a domestic support obligation determines that such debts are non-dischargeable. 11 USC 523(a)(5). During Lynn and David's divorce proceedings, David filed for protection under Chapter 13 of the bankruptcy code.

-10-

principles of equity. [*Berger v Berger*, 277 Mich App 700, 717; 747 NW2d 336 (2008) (emphasis added).]

The needs of the parties are factors to consider when dividing marital property. Thus, property division can be done with the aim of providing some type of support, although not technically "spousal support." Spousal support is a separate calculation that is undertaken *after* the estate and effects are awarded to the parties. See MCL 552.23(1).

Of greater import is the fact that the arbitrator and divorce court determined in this case that the division of the marital assets served for Lynn's support. That, however, did not transform the property division into "spousal support" in the ordinary sense. Characterization of a *property division* as "support" as defined under bankruptcy law serves the purpose of protecting the debt associated with the marital property from being discharged in a bankruptcy proceeding. Of further note is the fact that in the judgment of divorce, the court expressly detailed "spousal support" in its own subsection. Thus, when the parties later referred to "spousal support" in the stipulated order, they understood and intended that *that* aspect of the judgment of divorce be affected and not any marital property division or distributions. The stipulated order lacks ambiguity. Therefore, Lynn did not waive her right to the $742,650.80 awarded to her as part of the property distribution. Howard and Madison Equities' arguments lack merit. Accordingly, the trial court did not err by denying defendants' motion for a directed verdict, which they premised on this meritless waiver theory.

We also find no merit to defendants' claim that the trial court abused its discretion by not allowing them to file a motion for summary disposition after the court-imposed deadline for dispositive motions. Trial courts have inherent authority to set reasonable deadlines in scheduling orders and may enforce those deadlines. See MCR 2.401(B)(2); *Kemerko Clawson, LLC v RXIV Inc*, 269 Mich App 347, 349–350; 711 NW2d 801 (2005). Based on the record in this case, the trial court did not abuse its discretion by not permitting defendants' filing of an untimely motion for summary disposition. Even if we were to agree that the trial court erred and should have permitted them to file an untimely motion, such error was harmless because the underlying motion for summary disposition premised on this waiver theory would not have been successful. See MCR 2.613(A).

## C. ATTORNEY FEES

The Howard defendants argue that the trial court erred by including attorney fees in the judgment against them. We agree.

We review a trial court's award of attorney fees for an abuse of discretion. *Keinz v Keinz*, 290 Mich App 137, 141; 799 NW2d 576 (2010). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Id*. (citation omitted).

In this case, the trial court included an award of attorney fees in favor of Lynn against Madison Equities in the amount of $42,840, and against Fraser Equities in the amount of

$137,160.[9]  The trial court noted in the September 30, 2019 judgment that the Howard defendants had "failed to object to the award of attorney's fees to plaintiff when this Court initially determined the amount in a March 20, 2019 opinion."  It appears that the trial court concluded that defendants waived any issue regarding attorney fees.  We disagree with that conclusion.  Although the Howard defendants did not file any written objections to the March 20, 2019 judgment, they objected at the December 17, 2018 hearing to the award of attorney fees on the grounds that the UFTA did not authorize such an award, no other authority did so, and they were not parties to the divorce action.  The Howard defendants also argued to the trial court—before it entered the second judgment—that attorney fees lacked authorization because MCL 566.38 did not allow for attorney fees.  The record does not support the conclusion that the Howard defendants agreed to or waived the issue of attorney fees.  They raised the issue before the trial court and it ruled against them.  After those decisions, defendants were not required to move for reconsideration, as Lynn suggests on appeal.  Indeed, motions for reconsideration generally are not to be granted if they merely present the same issues ruled on by the trial court.  MCR 2.119(F)(3).

Turning to the merits of the Howard defendants' challenge to the trial court's award of attorney fees, we agree that the trial court erred because Michigan follows the "American rule." *Haliw v City of Sterling Hts*, 471 Mich 700, 706; 691 NW2d 753 (2005).  That rule provides that litigants pay for their own attorney fees because, " '[g]enerally, awards of costs and attorney fees are recoverable only where specifically authorized by a statute, a court rule, or a recognized exception.' " *Pioneer State Mut Ins Co v Michalek*, 330 Mich App 138, 146; 946 NW2d 812 (2019) (citation omitted).

In the March 2019 judgment, the trial court ruled, "Having reviewed the briefs, this Court finds that plaintiff is entitled to attorney's fees" in the amount of $180,000.  In the later judgment, the trial court apparently found that attorney fees were warranted because defendants failed to object to their inclusion.  From the trial court's initial reference to having reviewed the briefs, we infer that the court adopted Lynn's reasoning that attorney fees were recoverable.  In her arguments to the trial court, Lynn cited the judgment of divorce, which "awarded reasonable attorney fees and costs incurred with the recovery process."  While the judgment of divorce granted Lynn recovery of attorney fees that she incurred in the recovery of the fraudulently transferred assets, the Howard defendants were not parties to that divorce action, and therefore, were not bound by the judgment of divorce.  This Court emphasized this well-established principle in its previous opinion in this case:

> "[W]e have often repeated the general rule that 'one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.' " [*Baum*, unpub op at 7, quoting *Taylor v Sturgell*, 553 US 880, 893; 128 S Ct 2161; 171 L Ed 2d 155 (2008) (other citation omitted in *Baum*).]

Therefore, to the extent the judgment of divorce awarded Lynn attorney fees, that judgment did not extend to the Howard defendants who were not parties to the divorce action.  Accordingly,

---

[9] The awards of attorney fees in the September 30, 2019 judgment match the amounts initially awarded in the March 20, 2019 judgment.

any reliance on the judgment of divorce as grounds for imposition of liability against the Howard defendants for Lynn's attorney fees is misplaced and the trial court erred in doing so. We also recognize that nothing in the UFTA specifically authorizes an award of attorney fees to a successful plaintiff. Further, Lynn fails to identify any such statutory provision to support her contention that the Howard defendants may be held liable for her attorney fees.

No statutory authority or court rule specifically authorizes the awards of attorney fees against Madison Equities or Fraser Equities in conjunction with Lynn's successful UFTA claim. No other exception to the general rule applies in this case permitting assessing Madison Equities or Fraser Equities with Lynn's attorney fees. The trial court, therefore, erred by including attorney fees in the judgment against any of the Howard defendants. Accordingly, we reverse that portion of the judgment and remand for further proceedings.[10]

## D. ADMISSIBILITY OF PARTIAL TRANSCRIPT

Howard and Madison Equities argue that the trial court erred when it admitted a portion of Howard's 2005 deposition without admitting the remainder of it. We disagree.

We review preserved evidentiary issues for an abuse of discretion. *Nahshal v Fremont Ins Co*, 324 Mich App 696, 710; 922 NW2d 662 (2018). "An abuse of discretion generally occurs only when the trial court's decision is outside the range of reasonable and principled outcomes, but a court also necessarily abuses its discretion by admitting evidence that is inadmissible as a matter of law." *Id*. (citation omitted).

At trial, Lynn sought to introduce a portion of Howard's 2005 deposition taken in his own divorce case to show that he testified in that matter that David or Lynn owed no debt to Howard. The salient portion of his deposition testimony was as follows:

> *Q*. Okay. Does anybody owe you money?
>
> *A*. No.

Before trial, the Howard defendants filed a motion in limine to preclude the admission of the transcript excerpt. They argued that, because of the unavailability of the full transcript,[11] MRE 106 prohibited the excerpt's admission. The trial court disagreed and admitted the partial transcript. The trial court noted that defense counsel would be able to cross-examine and advance other arguments or explanations to the jury.

---

[10] Our decision does not address the issue of David's liability for Lynn's attorney fees as specified in the judgment of divorce which David never appealed.

[11] Apparently, no party had a copy of the full transcript. Lynn testified that, when Howard's ex-wife had heard about the fraudulent transfers and Howard's claim that the transfers were to pay back a loan or debt, she provided this limited portion of Howard's deposition transcript in the fall of 2012. Howard's ex-wife was deceased at the time of trial.

The trial court did not abuse its discretion.  MRE 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Defendants' reliance on this court rule to preclude the admission of the partial transcript is misplaced.  This rule "has no bearing on the admissibility of the underlying evidence." *People v Clark*, 330 Mich App 392, 421-422; 948 NW2d 604 (2019).  Instead, MRE 106 renders admissible other portions of testimony or a document that an adverse party wishes to admit "to provide a complete picture." *Id*. at 422.  Consequently, MRE 106 "would only be pertinent if [an adverse party] sought, but was denied, permission to have a complete writing or recorded statement introduced." *People v McGuffey*, 251 Mich App 155, 161; 649 NW2d 801 (2002).  Therefore, defendants' argument that MRE 106 *precluded* the admission of the partial transcript lacks merit.  The fact that no party possessed the full transcript had no bearing on the admissibility of the partial transcript.  The record reflects that the trial court permitted Howard to testify at trial and provide an explanation for his previous sworn testimony.  He stated that his deposition testimony related to business debts, not personal debts.  The jury had the duty to weigh the evidence.  See *Kelly v Builders Square, Inc*, 465 Mich 29, 40; 632 NW2d 912 (2001).

### E.  MOTION TO AMEND WITNESS LIST

The Howard defendants also argue that the trial court erred when it did not allow them to amend their witness list to include Tammy Adams.  We disagree.  We review a trial court's decision whether to allow a party to amend a witness list for an abuse of discretion. *Tinsbury v Armstrong*, 194 Mich App 19, 20; 486 NW2d 51 (1991).

After the court-imposed witness disclosure deadline, the Howard defendants moved to amend their witness list to add Adams as a witness.  They asserted that they recently became aware of a consent order entered by the federal court on March 21, 2018, which they contended showed that Adams had an interest in the profit-sharing/pension funds that David transferred to Madison Equities.  In response, Lynn argued that the motion should be denied because Adams's testimony lacked relevance and if relevant was nevertheless inadmissible under MRE 403; the court-imposed deadline had passed; and defendants failed to show good cause regarding why Adams should be added.  At the motion hearing, the Howard defendants argued that Adams's testimony had relevance to show that "there is someone else out there who has an interest in the [funds]."  The trial court denied defendants' motion, stating, "We're on the eve of trial, and the issues that are raised here I don't find to be relevant or germane to the issues pending.  As plaintiff's counsel points out, if there is this concern about competing claims, it can be resolved or addressed in an action independent of the case pending.  It also has the potential of confusing the jury."

The record reflects that the Howard defendants never fully explained why Adams's testimony had relevance to the issues presented in this case.  Some of the background facts as described in the federal court's consent order clarifies and confirms that the trial court did not abuse its discretion by denying defendants' motion.

The United States Department of Labor sued David and his law firm, David M. Baum, PC, alleging that David and the firm breached their fiduciary duties under the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 USC 1001 *et seq*., by misusing a total of $59,005.29 ($52,586.12 in principal and $6,149.17 in lost opportunity costs) for nonplan purposes between May 10, 2012 to November 5, 2014. Between May 2012 and August 2014, David withdrew $7,896.55 and used the money for personal and business expenses, and in November 2014, David disbursed $44,959.57 to his son, Brad Baum, bringing the balance of the ERISA plan down to $0. The consent order provided that, of the total amount, David and his law firm owed $23,650.26 to Adams's ERISA plan account and $35,355.03 to David's ERISA plan account. The Department of Labor agreed to forebear in return for David's commitment to repay the money by paying 100% of David's annual income in excess of $50,000 and 100% of any bequest, inheritance, repayment including a loan between David and Madison and Howard, gifts, lottery and gambling winnings over $10,000, and life insurance policy proceeds. The federal court ordered that Adams would receive her $23,650.26 plus interest directly, and the remainder to be paid into David's ERISA plan account. David, on behalf of the ERISA plan, assigned the plan's rights to the promissory note between Madison and the plan to Adams and authorized her to take any and all lawful action to recover the entire sum owed to her.[12]

In their motion to amend the witness list, defendants made the unsupported assertion that "any interest David Baum had in the 'transfer' to Madison Equities, LLC, was assigned to Tammy Adams." At the motion hearing, defendants' counsel stated:

> [S]o the dilemma that my client is now in and the relevance to adding Ms. Adams as a witness in this case is the fact that I have Plaintiff seeking $220,000.00 from my client, we have a judgment awarding Ms. Adams a significant piece of the same $220,000.00 and we need to defend that.
>
> * * *
>
> I want to establish that there's someone else out there who has an interest in the same amount of money. Now we don't want to pay twice if there is, and also show the validity of the fact that it was in fact a loan, and not a -- a just a transfer of money.
>
> The response to my motion seems to be it's not relevant. I think it is relevant, because it concerns the funds that are being sought by Plaintiff against my client in this very case.

The record reveals that defendants sought to present Adams as a witness to testify that she had a claim to a portion of the $220,000 that David, through his law firm, transferred to Madison in the form of a purported "loan." The consent order, however, did not award Adams a significant piece of the $220,000, as represented by defense counsel, but merely authorized Adams to take

---

[12] To be clear, the transfers at issue in the federal case did *not* involve the $220,000 from the pension fund that David purportedly loaned to Madison Equities. Instead, the federal action involved David's use of ERISA plan account monies, of which $23,650.26 belonged to Adams.

-15-

legal action to secure repayment of the money owed her from the purported "loan." Defendants left the relevance of Adams's actual rights under the consent order to the instant action unexplained. Defendants' counsel merely stated, "we don't want to pay twice," suggesting that they sought to avoid liability to two different parties. This case at bar, however, did not involve Adams or her separate claim for repayment of the money David pilfered from her ERISA account. Her proposed testimony lacked relevance to the matters involved in the instant case and the trial court, therefore, did not abuse its discretion by denying defendants' late motion to amend the witness list.

Even assuming her testimony could be deemed relevant for some purpose, the trial court properly ruled that MRE 403 precluded the evidence because Adams's right under the consent order to any portion of monies David transferred from David M. Baum, PC's ERISA plan accounts to himself and his son had no specific relation to any of the transfers at issue in this case. MRE 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, *confusion of the issues*, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. [Emphasis added.[13]]

Adams's right to payment did not arise from the $220,000 that David, through his law firm, transferred to Madison in the form of a purported "loan." The purported "loan" proceeds were merely identified as a source of money from which Adams could seek repayment if she took legal action to collect her money, not as the source of money taken from the ERISA plan accounts. The trial court did not abuse its discretion by ruling that the evidence's probative value was substantially outweighed by the risk of confusion of the issues. David's breach of his fiduciary duties as administrator of his law firm's ERISA plan had scant probative value to the matters at issue in this case. The consent order set forth Adams's right to recover her money from David and his law firm based on transfers that were not related to David's fraudulent transfers determined in the divorce action and sought by Lynn in the instant case. Accordingly, a substantial risk of confusing the jury existed if such evidence were admitted in this case. Therefore, because the trial court did not err in ruling that MRE 403 precluded the admission of Adams's testimony, it necessarily did not abuse its discretion by denying defendants' motion to amend the witness list.

### F. PREJUDICIAL EFFECT OF LYNN'S TRIAL STRATEGY

Fraser Equities contends that the trial court erred by permitting Lynn to prosecute her claims against David by painting him as a bad guy who fraudulently transferred assets and permitting her to describe Howard as a generous family member, which prejudiced Howard by somehow confusing the jury into rendering its verdict which did not find Howard liable to plaintiff. Fraser Equities seems to argue that plaintiff's trial strategy unfairly prejudiced Fraser Equities. The apparent gist of Fraser Equities' argument is that because Lynn portrayed David in a bad light

---

[13] Although the trial court did not actually cite MRE 403, it is apparent that it relied on that rule because Lynn argued, in part, that MRE 403 precluded the admission of Adams's testimony and the trial court commented that the evidence "has the potential of confusing the jury."

and Howard favorably at trial, that portrayal somehow prejudiced it. Fraser Equities argues that the trial court had a duty under MCR 2.513(B) to sua sponte declare a mistrial and conduct a new trial with David no longer a party. The record reflects that no defendant, including Fraser Equities, ever asserted in the trial court this convoluted argument. Therefore, Fraser Equities failed to preserve this issue for appeal. See *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005).

Michigan generally follows a raise or waive rule of appellate review. *Walters v Nadell*, 481 Mich 377, 387-388; 751 NW2d 431 (2008). Although our Supreme Court has held that this Court must review unpreserved errors in criminal cases for plain error affecting the defendant's substantial rights, see *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), it has not established a similar holding for civil cases. See *Walters*, 481 Mich at 387-388; see also *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 377-378; 761 NW2d 353 (2008) (stating that the failure to properly raise a claim of error before the trial court in a civil case normally constitutes a waiver of that claim). Nevertheless, this Court has the discretion to overlook preservation requirements if the failure to consider the issue would result in a manifest injustice, or if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented. See *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006). But this Court will exercise its discretion sparingly and only where exceptional circumstances warrant review. *Booth v University of Mich Bd of Regents*, 444 Mich 211, 234 n 23; 507 NW2d 422 (1993).

Because this issue is not preserved, Fraser Equities waived the issue and we decline to address it. We are not persuaded that failure to consider the issue would result in manifest injustice and consideration of the issue is unnecessary for a proper determination of the appeals in this case.

## G. OMISSION OF ISSUE ON SPECIAL VERDICT FORM

Lynn argues on cross-appeal that the trial court erred by failing to enter a judgment against Howard individually. She contends that, because the special verdict form to which the parties stipulated did not require the jury to make the requisite finding that Howard was the person for whose benefit the fraudulent transfers were made, the trial court could assign him personal liability and enter judgment against him for the amounts David fraudulently transferred to Madison Equities and Fraser Equities. We disagree.

This issue requires the interpretation and application of statues and court rules, which are questions of law that we review de novo. *Klooster v City of Charlevoix*, 488 Mich 289, 295; 795 NW2d 578 (2011); *Webb v Holzheuer*, 259 Mich App 389, 391; 674 NW2d 395 (2003). We review for an abuse of discretion a trial court's denial of a motion for reconsideration. *Luckow Estate v Luckow*, 291 Mich App 417, 423; 805 NW2d 453 (2011). An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes. *Id*.

Lynn argued in the trial court that the UFTA allowed the trial court to enter a judgment against Howard, even though the jury had found in the stipulated special verdict that none of the

fraudulently transferred money had gone to him.[14]  MCL 566.38(2)(a)(*i*) provides that a plaintiff's judgment under the UFTA may be entered against either "[t]he first transferee of the asset or the person for whose benefit the transfer was made."  Lynn maintained that Howard constituted the person for whose benefit the transfers were made and sought entry of a judgment against him personally and not his business entities.  While the trial court initially agreed, following the Howard defendants' objection, it revisited its decision and denied Lynn's motion for reconsideration because it concluded that the jury failed to make any finding related to whether Howard was the person for whose benefit the transfer was made, and therefore, it could not enter a judgment against him.

There is no dispute that the jury never made any finding related to whether the transfers were made for the benefit of Howard because the stipulated jury verdict form did not require the jury to consider or determine whether the transfers were for Howard's benefit.  Lynn argues that MCR 2.515(C) permitted a trial court to enter judgment against Howard individually despite the fact that the jury returned the special verdict that indicated specifically that David had not fraudulently transferred money to Howard.

MCR 2.515(C) states:

> If the court omits from the special verdict form an issue of fact raised by the pleadings or the evidence, a party waives the right to a trial by jury of the issue omitted unless the party demands its submission to the jury before it retires for deliberations.  The court may make a finding with respect to an issue omitted without a demand.  If the court fails to do so, it is deemed to have made a finding in accord with the judgment on the special verdict.

In this case, the parties stipulated to the instructions to be given by the trial court to the jury and the trial court charged the jury with those agreed-upon instructions before they deliberated. Respecting Lynn's fraudulent transfer claim, the parties agreed to have the trial court instruct the jury as follows:

Fraudulent Transfer Claim by Plaintiff, Lynn Baum

> Plaintiff, Lynn Baum has brought a fraudulent transfer claim against Howard Baum, Madison Equities, LLC and Fraser Equities, LLC.  Her claim was brought under the Uniform Fraudulent Transfer Act or UFTA.  The UFTA is "designed to prevent debtors from transferring their property in bad faith before creditors can reach it."

MCL 566.34(1) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before

_____

[14] The jury specifically found that David transferred $0 to Howard, but transferred $240,583.90 to Madison Equities and $771,451.76 to Fraser Equities.

-18-

or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . :

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

By a preponderance of the evidence Lynn has the burden to prove:

(1) David made transfers of his assets or his interest in assets to the Defendants, Howard Baum, Madison Equities, LLC and Fraser Equities, LLC;

(2) Lynn had a claim against David;

(3) Lynn was a creditor of David;

(4) Lynn's claim arose before or after David's transfers to the Defendants; and

(5) David had actual intent to hinder, delay or defraud Lynn or any of his other creditors.

• The factors listed in "Applicable Law# 1" and below assist in determining whether there was actual intent to hinder, delay or defraud Lynn or any of his other creditors. These factors include:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all of the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

-19-

(j)  The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k)  The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

The record further reflects that, having been so charged, the jury returned the special verdict on that count as follows:

VERDICT FORM WITH: FRAUDULENT TRANSFER

We, the jury, answer the questions submitted as follows:

1.  Were there transfers from David Baum to the Defendants, Howard Baum, Madison Equities, LLC or Fraser Equities, LLC?

     Yes X No_

2.  How much was transferred to each Defendant?

     $ 0 Howard Baum

     $ 240,583.90 Madison Equities, LLC

     $ 771,451.76 Fraser Equities, LLC

3.  Was Lynn a creditor of David?

     Yes X No _

4.  Were the transfers of property of David's or in which he had an interest?

     Yes X No _

5.  Did Lynn have a claim against David?

     Yes X No _

6.  Did Lynn's claim arise before David's transfers to the Defendants?

     Yes X No_

7.  Did Lynn's claim arise after David's transfers to the Defendants?

     Yes X No _

-20-

8. Based on the factors in MCL 566.34(2), did David Baum have the actual intent to hinder, delay or defraud Lynn or any of his other creditors? (See Jury Instruction 2. 02).

Yes X No _

Although the parties could have requested that the trial court charge the jury requiring it to consider and make a finding regarding for whose benefit the fraudulent transfers were made, they neither requested nor demanded such instruction. Further, although the parties could have required the jury to make a specific finding of fact in their special verdict form regarding for whose benefit the fraudulent transfers were made, they did not do so. The record reflects that plaintiff never made a demand to the trial court to submit that question to the jury before it retired for deliberations. The trial court did not make a finding of fact on the issue, and therefore, under MCR 2.515(C), the trial court must be deemed to have made any such finding in accord with the judgment on the special verdict. Contrary to plaintiff's contentions, MCR 2.515(C) does not authorize a trial court to make a finding of personal liability of a defendant after the jury has been charged with its instructions, deliberated as instructed, and entered its verdict in accord with a special verdict form to which the litigants stipulated and the trial court submitted for the jury's rendering of its decision.

Moreover, we find no merit to plaintiff's claim that the trial court had authority after the fact to enter a judgment against Howard for personal liability for the full amount of the fraudulently transferred money, as the jury found that no money had been transferred to him personally. Had plaintiff desired the jury to answer the question of for whose benefit David fraudulently transferred the money, she should have demanded that the jury make a specific finding of fact in that regard. Because she failed to request that a particular finding be included in a special verdict form, she waived the right for the jury to make that factual finding. MCR 2.515(C) cannot be read to permit the trial court to make such a critical liability determination after the return of the jury's verdict. We conclude that the trial court did not abuse its discretion by denying plaintiff's motion for reconsideration which improperly requested that the trial court amend the judgment and make an ultimate liability finding that the transfers were for the benefit of Howard. The trial court correctly determined that the jury never made that finding of fact and that the trial court could not correct any inadequacy in the agreed-upon special verdict form.

## III. DOCKET NO. 353066

In Docket No. 353066, Howard raises several challenges to the trial court's order holding him in criminal contempt of court, but none requires reversal.

## A. DUE PROCESS

Howard first argues that the trial court denied him due process when it found him guilty of contempt of court. We disagree. Howard failed to preserve this issue by not raising it before the trial court. See *Hines*, 265 Mich App at 443. We review unpreserved constitutional issues for plain error affecting substantial rights. *Carines*, 460 Mich at 764. "The issuance of an order of contempt rests in the sound discretion of the trial court and is reviewed only for an abuse of discretion. If the trial court's decision results in an outcome within the range of principled

-21-

outcomes, it has not abused its discretion" *In re Contempt of Henry*, 282 Mich App 656, 671; 765 NW2d 44 (2009) (citations omitted).

The trial court found Howard in contempt of court for failing to appear when ordered to do so. The trial court required him to appear in court at 8:30 a.m. on March 6, 2020, to hear the trial court's ruling on Lynn's motion seeking to hold Howard and Fraser Equities in contempt for violating the injunction imposed by the trial court prohibiting asset transfers. In relation to that contempt matter, the trial court held an evidentiary hearing at which the trial court afforded Howard an opportunity to show cause why he should not be held in contempt. When Howard failed to appear at the ordered 8:30 a.m. hearing without contacting or informing the trial court of any reason justifying his absence, the trial court ordered him to appear at 11:00 a.m., and when he again failed to appear, the trial court gave him until 3:00 p.m. to do so. Howard, however, failed to appear at 3:00 p.m. When the trial court convened around 3:30 p.m. that afternoon, the trial court recounted how it had ordered Howard to appear at 8:30 a.m., 11:00 a.m., and 3:00 p.m., and how Howard had failed to meet any of those deadlines. The trial court gave defense counsel an opportunity to provide an explanation. Defense counsel responded that Howard had been at an urgent care facility and then a pharmacy, and only after he finished he communicated with counsel.[15] Defense counsel stated further that Howard decided not to go to the hospital because of a purported 10-hour wait for emergency services, necessitating Howard's visit to urgent care where he was diagnosed with pneumonia and prescribed a five-day course of antibiotics. The trial court found defense counsel's explanations unpersuasive, found Howard in contempt of court, and sentenced him to five days in jail.

On appeal, Howard claims that the trial court violated his right to due process by finding him guilty of contempt in a summary proceeding, which he argues is only permissible when the contempt occurs within the view of the court. Howard argues that the contemptible conduct here (not appearing when ordered to do so) constitutes indirect contempt or contempt committed outside the presence of the court. See also *In re Contempt of McRipley*, 204 Mich App 298, 301; 514 NW2d 219 (1994) ("It is well settled in this state that an attorney's failure to appear in court on a hearing date is contempt committed outside the presence of the court."). The parties disagree whether the trial court afforded Howard due process.

Under MCL 600.1701(g), a court is authorized to hold a party in contempt of court "for disobeying any lawful order, decree, or process of the court." MCL 600.1711(2) provides that "[w]hen any contempt is committed other than in the immediate view and presence of the court, the court may punish it by fine or imprisonment, or both, after proof of the facts charged has been made by affidavit or other method and opportunity has been given to defend." With regard to due process,

> [n]o person may be deprived of life, liberty, or property without due process of law. The essence of the right of due process is the principle of fundamental fairness.

---

[15] During the earlier proceedings that day, Howard's counsel attempted to contact him without success and Howard never responded. Defense counsel represented to the trial court that Howard sent an e-mail around 4:14 a.m. that morning in which he claimed to have a 103-degree fever and said that he intended "to take some medications and go to bed."

-22-

The concept of due process is flexible, and analysis of what process is due in a particular proceeding depends on the nature of the preceding, the risks involved, and the private and governmental interests that might be affected. A criminal contempt proceeding requires some of the safeguards of an ordinary criminal trial. A defendant charged with contempt is entitled to be informed whether the proceedings are civil or criminal. Further, a defendant in a criminal contempt proceeding is entitled to be informed of the charge, to be given an opportunity to prepare his or her defense, and to secure the assistance of counsel. The defendant has a presumption of innocence and a right against self-incrimination. [*In re Contempt of Henry*, 282 Mich App 656, 669; 765 NW2d 44 (2009) (citations omitted).]

We are not persuaded by Howard's argument that the trial court summarily found him in contempt. The record reflects that the trial court conducted a proceeding at which it afforded defense counsel opportunities to defend and explain Howard's absence and failure to communicate with the court, and when Howard missed the 11:00 a.m. deadline without excuse, the trial court gave counsel further opportunity to explain Howard's absence. Instead of immediately issuing a bench warrant, the trial court set a later deadline giving Howard further opportunity to comply. When Howard missed the 3:00 p.m. deadline without contacting or communicating with the trial court, it gave defense counsel further opportunity to place on the record whatever explanation Howard had for his failure to obey the trial court's orders. The record indicates that the trial court gave Howard notice and opportunity to defend. Howard's due-process argument, therefore lacks merit and he has failed to establish plain error.

## B. ADEQUATE FINDINGS

Howard next argues that the trial court failed to make adequate findings of fact to support his criminal contempt conviction. We disagree. A trial court's factual findings are reviewed for clear error. *Chelsea Investment Group LLC v City of Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). "Clear error exists only when the appellate court is left with a definite and firm conviction that a mistake has been made." *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463, 471; 719 NW2d 19 (2006) (quotation marks and citation omitted). Further, this Court reviews questions of law de novo. See *Kocher v Dep't of Treasury*, 241 Mich App 378, 380; 615 NW2d 767 (2000).

"When adjudicating contempt proceedings without a jury, a court must make findings of fact, state its conclusions of law, and direct entry of the appropriate judgment." *In re Contempt of Henry*, 282 Mich App at 674; see also MCR 2.517(A)(1) ("In actions tried on the facts without a jury . . . , the court shall find the facts specially . . . ."). "Factual findings are sufficient as long as it appears that the trial court was aware of the issues in the case and correctly applied the law." *People v Legg*, 197 Mich App 131, 134; 494 NW2d 797 (1992) (citation omitted).

On appeal, Howard seems to focus on what transpired at the March 6, 2020 hearing after the court reconvened around 3:30 p.m. and ignores what happened before that time. The trial court's factual findings during the 3:30 p.m. session were sparse, with the court merely recounting that Howard had been ordered to appear and failed to meet any of the deadlines, including the one set for 3:00 p.m. The record, however, indicates that the court made previous findings and stated

that it was "not persuaded by the presentations of counsel that [Howard's] failure to appear here today is occasioned by anything other than an attempt to avoid being present when the Court entered its opinion and order on the issue of contempt." The trial court observed that

> the reason being provided is an illness that [Howard] has been suffering based upon representation of counsel since on or about January of this year, and based upon representations of counsel that even on his appearance on February 28th, 2020, during the course of the proceedings, he was present, and he was still operating or suffering from flu-like symptoms.
>
> What's the difference in the Court's view from February 28th until today's date? The Court finds it to be this. That I have not announced any intention of rendering any opinion in this case [until] February 28th when the case was here, but I made clear the Court's intention to render that opinion on the evidence that's been placed before the Court on today's date, and therefore, [Howard] was aware of today's date and what its potential was if the Court found him in contempt.
>
> Again, I have no evidence before the Court that [Howard] is suffering from anything. I have counsels' representations as an officer of the Court; given the history of this case, given [Howard's] history, I do not find them persuasive . . . .

The court further elaborated on its concern, stating:

> Now, the other issue that's at hand here, and I just want you to appreciate this from my perspective as the judge, you haven't even had any contact with him since 4:00 a.m. You as his attorneys that have appeared here in court and made an effort pursuant to my order at approximately 9:15 to contact your client, have not been able to do so.
>
> One doesn't know where [Howard] is, and that is a significant problem for me as a judge that the two attorneys that represent him cannot indicate to this Court where he is, what's going on with him at this moment. From 4:00 a.m. until this moment many things could have occurred. He could have been feeling well and decided I'm going to get in my car and drive south, I'm going to find the sun. That's a possibility. He could be -- it's just about noon, he may be still having brunch somewhere, I don't know. That's a possibility. But you as counsel for him can't speak to it, because as you've said to me I tried, I sent him an email, he didn't answer, I tried the phone, he didn't answer. Mr. Frank says that he didn't answer. So we don't know where [Howard] is. You cannot represent to me because you don't know if he's had a turn for the good, if his temperature broke, and he just decided to go do something else. You don't know that, and that's troublesome. It is absolutely troublesome for me as a judge, that I had a defendant in a criminal contempt proceeding present here in court, and on the date that his potential [punishment] may have been handed out, he was not here.

Contrary to Howard's assertion on appeal, the trial court considered defense counsel's representations but found them unpersuasive and in light of Howard's previous conduct. The trial

court expressed its concern that Howard sought to avoid the consequences of the other contempt proceeding. Although the trial court did not restate its findings after Howard appeared at 3:30 p.m., the record does not reflect that the trial court had discarded its previous findings. Although the trial court questioned Howard's illness earlier in the day when there had been no contact with him, at the 3:30 p.m. session defense counsel represented to the trial court that Howard went to urgent care and had been diagnosed with pneumonia and prescribed medication. That the trial court questioned and perhaps disbelieved counsel's representations regarding Howard's illness is not dispositive of his contempt. In our view, the explanations and defense offered by Howard through counsel at the 3:30 p.m. session did nothing to cast doubt on the court's previous finding that Howard had intentionally violated the court's orders. Noticeably absent from defense counsel's explanation to the trial court was any discussion of timing and no mention of when Howard actually sought and obtained treatment at the urgent care facility or the pharmacy. The trial court could reasonably question whether Howard had been at urgent care from the early morning hours until nearly 3:00 p.m. that afternoon, especially when counsel represented to the trial court that morning that Howard simply intended to go "to bed." Counsel also never explained why Howard's attendance at urgent care made it impossible for him to communicate with his attorneys and the trial court, despite his counsel's numerous messages and calls to him. Thus, the trial court's findings were adequate, and we are not left with a definite and firm conviction that the trial court made a mistake.

## C. NEW JUDGE ON REMAND

Howard argues that if this Court were to remand, then it should reassign this case to a different judge. We disagree.

There are three factors that an appellate court should consider in determining whether to reassign a case to a different judge:

> "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." [*People v Walker*, 504 Mich 267, 285-286; 934 NW2d 727 (2019) (citation omitted).]

The main problem with Howard's position is that it is premised on the conclusion that the trial court erred when it held Howard in contempt. However, as already discussed, we do not agree that the trial court erred. Given the proffered explanations before it, the trial court's finding on that matter were not clearly erroneous. Accordingly, no grounds exist for ordering that this case be reassigned to a new judge on remand.

## IV. CONCLUSION

In Docket No. 351269, we affirm in part, reverse in part, and remand for further proceedings. Specifically, we reverse the imposition of attorney fees against any of the Howard defendants. In Docket No. 353066, we affirm.

Affirmed in part, reversed in part, and remanded for further proceedings.  We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Stephen L. Borrello
/s/ Jonathan Tukel